No. 28.—Moses Mounce, plaintiff in error, *vs.* James Byars *et al.* defendants.

[1.] An amendment to the answer, by way of supplement, in Equity, will be allowed, upon the ground of mistake as to facts stated in the original answer—more particularly where the correction is not prejudicial to the complainant.

[2.] In causes in Equity, according to the laws of Georgia, the facts are to be submitted to a special Jury, who have the exclusive right to pass upon them; and all questions of law are for the determination of the Court alone.

[3.] It is competent for the Judge to dismiss a bill at the trial, upon the ground that the complainant has introduced *no evidence whatever*, to a point which, according to law, he must prove, to entitle him to recover.

[4.] In a bill filed against subsequent purchasers, to enforce the vendor's lien, the Court may dismiss the bill at the trial, if there is *no evidence whatever* of notice of the lien.

[5.] If, upon a trial in Equity, on a bill to enforce the vendor's lien, there be any evidence, however slight, to sustain the plaintiff's case, the cause ought to be submitted to the Jury.

[6.] Notice of the lien of the vendor, brought home to the agent of the purchaser, is constructive notice to the purchaser.

In Equity, in Butts Superior Court.   Tried before Judge Stark, September Term, 1851.

The bill charges, that in 1839, he was owner of one hundred and twenty-two acres of land, divided into several lots, and known as a part of the McIntosh or Indian Spring Reserve, situated in the County of Butts, which he had purchased of one Robert Coleman, who had purchased them at public sale, previously made by commissioners appointed by the authority of the State, for that purpose; that Coleman had paid the several instalments due the State for said land, the receipt of which payments was indorsed upon the certificates of sale, given by said commissioners; that Coleman transferred said certificates to the complainant, for a fair and valuable consideration; that complainant, on the 13th day of November, 1839, sold the said land to James Byars, for the sum of $1300, for which he took

Byars' notes, the last one of which fell due the 1st of January, 1842; that at the time of filing the bill, there remained due to complainant of said purchase money, the sum of $925 42 cents, principal and interest.

The bill charges, that at the time of the sale, no grants had issued to said lots of land, except lot number forty, to which complainant executed to defendant a deed in fee simple, and that he transferred to defendant the said certificates of sale of the other lots; that the defendant went immediately into possession of said lots, under the said sale.

The bill charges, that in 1839 or 1840, defendant sold the said lots to one William Byars, his brother, who resides in the County of Butts; and that immediately after said sale, the defendant, James Byars, ranaway and left the State; and that in a short time, the said William Byars sold, or pretended to sell, said lots to Richard G. Byars and John Goodman, both of Butts County, and who are now in possession of said lots; that at the time James Byars left the State, he carried all his property and effects with him.

The bill charges, that complainant took no security on the notes given for the purchase money of said lots of land.

The bill also charges, that William Byars, Richard G. Byars, and Goodman, at the time they purchased the said lots of land, had notice, and were apprised of the fact that the defendant, James Byars, had not paid complainant the purchase money for said lots of land.

The bill prayed that the Court might decree the sale of the land and order the proceeds to be applied to the payment of his debt against James Byars.

The defendants, William Byars and John Goodman, filed their answers, denying that at the time they became the purchasers of said lots of land, they had any knowledge or notice of the purchase money, or any part thereof, remaining unpaid to complainant, by the defendant, James Byars, &c. &c.

The defendant, Goodman, in his answer stated, that in the spring of 1840, he purchased of William Byars, two of the said lots of land, numbers 66 and 67, and received from him the

original grants from the State· and a deed in fee, conveying said lands. Goodman denied all knowledge or notice of the purchase money remaining due to complainant, from James Byars for said lots, &c.

The defendant, James Byars, having failed to answer, the bill on the trial was taken *pro confesso*, as to him.

On the trial, before the cause was submitted to the Jury, the defendant, Goodman, moved the Court to amend his answer, in substance and effect, as follows: "that the contract for the purchase of the two lots, marked 66 and 67, was originally made by this defendant, with James Byars, with the consent of William Byars; but that he subsequently received the grants of the State and a deed in fee simple, from William Byars," &c.

Counsel for complainant objected to the filing of the amended answer, on the ground that it contradicted a sworn answer previously filed by the amending party, in a material point, by stating facts which might have been stated in the original answer.

The objection was overruled by the Court, and counsel for complainant excepted. On the trial, Joel Byars, sworn—stated, "that he heard a conversation between Richard G. Byars and William Byars. Richard bought the half of lot of land, called the King Place, of William Byars, at the price of $600. Richard, in 1840, wanted to dispose of the King Place and wanted a place nearer the Springs. James Byars offered to swap with Richard, a part of the land he got of Mounce, and asked Richard $150 to boot. Richard offered him $50. Richard got witness to make the trade with William; and after Richard went home to Cherokee, William came to witness and told him to hold on, he would arrange the trade, and let witness have the Mounce place, for he wanted the King Place back again. And after that, William came and carried witness with him to James Byars, and told James that he was going to let me have the land for Richard. James Byars' wife remarked, "you had better let Mounce have his land back, for she knew he, James, would

Mounce *vs.* Byars *et al.*

never be able to pay for it; whereupon they all became angry," &c. &c.

After complainant closed his testimony, counsel for defendant moved to dismiss the bill.

Which motion was sustained by the Court, and counsel for complainant excepted, and upon these exceptions have assigned error.

HAMMOND & HARMAN, for plaintiff in error.

JNO. FLOYD, for defendants in error.

*By the Court.*—NISBET, J. delivering the opinion.

[1.] It does not appear on the record, that the defendant made known to the Court, when he asked leave to amend, what he expected to put in his amended answer, and that the application was accompanied with affidavits. These things are indispensable. But it was conceded in the argument, that this rule was, in fact, complied with. The strictest guard should be held upon amendments to sworn answers. Laxity here might work consequences the most disastrous to the administration of justice. The Court should be informed, before allowing an amendment, what the original answer is, and what new fact or circumstance is proposed to be added, or wherein and to what extent the original answer is proposed to be modified; and the application to amend, ought to be supported by affidavits. These amendments are, like others, within the discretion of the Chancellor. This discretion in these cases, however, is extremely limited in its range. They should not be permitted, unless it is palpably clear, that they are necessary to advance the ends of justice. Rarely, very rarely, ought an amendment to be allowed, when the addition or alteration is prejudicial to the interest of the complainant. The principles upon which the doctrine of amendments to answers, in Equity, is based, were carefully considered by this Court, in *Martin vs. Atkinson,* (5 *Geo. R.* 390;) and it suffices, therefore, to refer now to that

case. We there held that an amendment would be allowed, to correct a clear mistake in a matter of fact, discovered after the filing of the answer. The more readily will a mistake be corrected, when the correction does not vary the case, so as to make it more strongly against the complainant. We learn from this supplemental answer, that its object was to correct a mistake of fact—it states the mistake and corrects it, by stating the facts truly. The correction is not prejudicial to the plaintiff in the bill. The bill is filed against several defendants, to enforce the vendor's lien. One of them, *Goodman,* states in his answer, that he bought his lands, upon which the lien was sought to be enforced, from *William Byars,* (who, the bill charges, was a purchaser from the complainant's vendor, *James Byars ;*) and that he paid the purchase money, in part, in satisfaction of a debt, owing by *James Byars* to him, and the balance was paid to *William Byars,* to be applied to a debt due by *James Byars* to *Wm. Jones,* and upon which *William Byars* was security. The mistake is in the statement, that he bought the land from *William Byars,* and paid over to him the balance of the purchase money. The defendant corrects it by saying that he bought from *James Byars,* with the consent of *William Byars,* and that he paid the balance of the purchase money to *James Byars.* He explains the transaction in the supplemental answer at large. The substance of the explanation is, that *William Byars* had an equitable interest in the lands, being holder of the certificates transferred to him by *James Byars;* that the defendant preferred to take a title from *William Byars;* and buying from both *James and William,* it was agreed that the grant should issue to *William Byars,* and that he should make a deed to the defendant, which was done; and after paying the debt due to him by *James Byars,* he paid the balance of the purchase money to him, *James Byars,* and not to *William,* as at first stated. Looking at the whole case, we do not see that this alteration of the original answer, changes the character of the controversy materially, between the complainant and any of the defendants. It presents truly the relations between *Goodman* and the *Byars's,* relative to the purchase of the lands; and disburdens the con-

Mounce *vs.* Byars *et al.*

science of *Goodman.* These were, no doubt, the objects which the amendment was intended to effect. It was, we think, properly granted.

The presiding Judge dismissed the bill at the hearing, upon the ground that there was *no evidence* to show that any of the defendants had notice of the complainant's lien. Upon this ruling of the Court, the complainant excepted, and the bill of exceptions makes two points:

*First.* It is claimed, that if it be true, that there is no evidence of notice, yet, in Georgia, the Chancellor has no power to dismiss the case.

*Second.* That there *was* evidence of notice sufficient to take the cause to the Jury.

The first claim assumes, that in this State, the powers of the Judge and of the Jury, in causes in Equity, are joint. This assumption goes the length of saying that the Judge can render no judgment on the law, without the concurrence of the Jury; that in this case, for example, the Judge could not order the dismissal of the bill, upon the ground that the complainant had introduced no evidence to a fact material in law to be proved, without a decree of the Jury, finding, that for *that* reason the bill should be dismissed.

[2.] This assumption, that there is a union in the Judge and Jury, of all the powers of a Court of Chancery, involves also, this other and farther consequence, to wit, that the Judge may and indeed ought to unite with the Jury, in determining upon the facts; and that they can no more decree, as to them, without his concurrence, than he can decree on the law without their concurrence. That there has prevailed in Georgia, opinions thus extreme, we are not ignorant. To these opinions we can give no countenance. *We hold, that in Equity, as at Law, the province of the Jury is to try the facts; and that the Judge has no more right, in Equity, to pass upon the facts, than he has at Law; and that it is the province of the Judge, in Equity as at Law, to adjudge the law; and that the Jury have no more power to pass upon the law of the case in Equity, than they have at Law.* The functions of Judge and Jury are separate. Courts of Equity

have, in this State, general jurisdiction, according to those principles of Equity, by which the same jurisdiction is exercised in England. We adopted the principles of Equity, as understood in England, as well as the rules of the Common Law, strictly so called, and with the same limitation. We adopted the Equity Jurisprudence of Great Britain as a system, so far as it was suited to our circumstances, and not repugnant to the genius of our institutions. Wherever and to whatever extent that system is changed or modified by Statute, of course the Statute is the law. *Beall vs. the surviving executors of Fox*, 4 *Geo. Rep.* 404. The character of the tribunal and the mode of trial have been changed; and the great change of the character of the tribunal and the mode of trial, consists in this, that a Jury, with exclusive power to find the facts, is substituted in lieu of the Chancellor or a Master, in England. This substitution also dispenses with the usage of the Courts of Chancery in England, of sending cases, in particular instances, down to the Courts of Law, to find the facts. I think it is clear, from our own Statutes, that the Jury was introduced into our Chancery Courts, for the purpose alone of deciding on the facts; leaving the Judge clothed with supreme authority over the law, as in England. Here, so far as the law is concerned, the Judge is the Chancellor; and so far as the facts are concerned, the Jury are the Chancellor. Just in the sense are they the Chancellor in Georgia, that the Judge is Chancellor in England, when in the exercise of his rightful authority there, of determining facts. It is in this light that it may be properly said, that in Georgia, the Judge and the Jury constitute the Chancellor. And this, and no more is meant, when, in *Hargraves and another vs. Lewis*, the Judge writing the opinion, says, "in Georgia, the Judge and the Jury constitute the Chancellor." (3 *Kelly*, 169.) This substitution was made by the Act of 1792, which was repealed by the Act of 1797, which re-enacted the provision of the former Act in reference to it. It is from these two Acts that we derive the powers of a Jury in Equity causes. It is very remarkable, that the Act of 1799, which repeals the Act of '97, in relation to the Equity powers of the Superior Courts, is itself

Mounce  *vs.* Byars *et al.*

silent about a Jury trial at all, in Equity. It makes specification of the Chancery powers of the Superior Courts, and proceeds to declare, " and the proceedings in all such cases, shall be by bill and such other proceedings as are usual in such cases, until the setting down of the cause for trial; and the Courts shall order the proceedings in such manner as that the same shall be ready for trial, at the farthest, at the third term from the filing of such bill, inclusive, &c." Now, there is no express authority for the intervention of a Jury in this Act of '99. It pursues the tenor of the two Acts of '92 and '97, in relation to the *proceeding*, until the setting down of the cause for trial, and at that point, drops the provisions of these two Acts. By designating the proceedings, and declaring that they shall be by bill, and such other proceedings as are usual in such cases, until the cause is set down for trial, it is clear that the Legislature meant to adopt such proceedings up to that time as are usual in the Chancery Courts of Great Britain, whose general Chancery Law it had previously adopted, by the Act of 1794; and it is also inferrable, that after that time, it contemplated some mode of trial *different* from what was usual in such cases in the English Courts. But, I repeat, that it is a singular and unaccountable fact, that this Act, which is confessedly a reorganization of the Judiciary system of the State, and which, in terms, repeals the Act of 1797, should not declare in what that difference should consist, and how the trial should be conducted. As this was a new jurisdiction, cast upon the Courts of Law, when already the trial by Jury obtained in trials at Law, it would be possible to infer that the Legislature intended trials in Equity to follow the course of trials at Law; and thus, by construction, derive Jury trials in Equity, from the Act of 1799. Such derivation is not very satisfactory to my mind. But we are not left alone to the Act of 1799. Although the Act of '97 is repealed by this Act of '99 ; yet, its provision as to the powers of a Jury, in Equity causes, is saved by the Constitution of '98. I mean to say, that if the Act of '99 be admitted to have repealed the Act of '97, in relation to the trial of causes in Equity, by a Jury, and thereby abrogated the trial

by Jury in Equity, that, *pro tanto*, it is void, because repugnant to the Constitution of '98. That Constitution declares, that "trial by Jury, *as heretofore used* in this State, shall be inviolate." Now, the Act of 1797, which re-enacted the Act of '92, was in force when the Constitution of '98 was adopted. By the Acts of '92 and '97, the trial by Jury *was used* in this State in Equity causes, and it was used as prescribed in those Acts. Any law, therefore, passed subsequent to the Constitution, which repealed those Acts, and defeated the usage of trial by Jury, which they prescribed, is void. Thus it is, that the trial by Jury, in Equity causes, is derived from the Acts of '92 and '97. *Hargraves vs. Lewis,* 7 *Geo. R.* 125. *Dudley's R.* 8. *Cobb's New Dig.* 467, 1143.

And it is upon this process of reasoning alone, that appeals were sustained in Equity causes; for there is no law which authorizes them, since the Act of 1797, until the Act of 1843. The right of appeal, given by the Act of 1799, has been usually conceded—and it seems to me, necessarily conceded—to refer to cases tried at Law. These remarks about appeals being parenthetical, I proceed to inquire—having traced the trial by Jury, in Equity, to the Act of '97—what, according to that Act, are the relative powers of the Judge and the Jury. The Act of 1792, and also the Act of 1797, provides, that "the Superior Courts shall be competent to sustain a suit, by bill and proceeding therein, until the setting down of the cause for hearing; such Superior Courts shall then submit the merits of the suit, with the evidence thereon, which, in all cases, shall be given *viva voce*, (or otherwise, within the rules of the Common Law;) and all matters respecting the same, to a special Jury, who shall give their verdict on the same; but if either party shall be dissatisfied with such verdict, an appeal may be entered in the Clerk's office within ten days after trial, when a hearing of such cause shall again be had before another special Jury, and such trial shall be final and conclusive." *Watkins' Dig.* 480, 621, 622. The Act of 1799, so far as it relates to the action in a cause *before* it is set down for a hearing, although somewhat variant in its verbiage, is in substance, the same

Mounce *vs.* Byars *et al.*

with the Act of 1797. The latter Act declares, that it shall be competent for the Courts to *sustain a suit by bill and proceedings therein, until, &c.* The former Act declares, that " the proceedings, in all such cases (cases of equitable cognizance) shall *be by bill, and such other proceedings as are usual in such cases, until, &c.*" So far as this clause is concerned, having reference to the action of the Court and not of the Jury, the Act of 1799 is the law. For the purposes of construction, however, it is competent to consider the clause in the Act of 1797, in connection with the clause quoted from the Act of 1799. For, although repealed, an Act in *pari materia,* may be, for that purpose, considered. The clause, then, in the Act of '99, viewed in the light which is shed upon it by the Act of '97, is clearly intended to prescribe the manner of proceeding, *by the Court,* in carrying out the jurisdiction in Chancery, which that Act enforced, up to the setting down of the cause for trial. The mode prescribed, is by *bill* and such *other proceedings as are usual in such cases. Such cases* refer clearly to all the cases of Equity jurisdiction enumerated, and to all cases originating under the general jurisdiction, which, according to the decision of this Court, this Act confers. This is necessarily inferrable ; because, the Act declares that the Superior Courts shall exercise the *powers* of a Court of Equity, in all cases where a Common Law remedy is not adequate ; proceeds to enumerate certain cases, in which the powers of a Court of Equity shall be exercised ; after which, it provides, that in *all such cases,* the proceeding shall be by bill and such other proceedings as are usual in *such cases.* That is manifestly cases in Chancery, over which the Courts are vested with jurisdiction ; for the last use of the words *such cases* has reference to the cases referred to in the first use of the same words, and their first use is in reference to the cases of jurisdiction. The proceedings are to be by bill, and such other proceedings as are *usual* in such cases. That is, the *bill* of Courts of Equity and the other proceedings *usual* in Courts of Chancery in England and, in the State, prior to that time. I have already said that the Chancery law of Great Britain had been adopted—we had no other Equity system but that—we had no Co-

lonial or State legislation, prescribing proceedings in Chancery; and there is no escape from the conclusion, that in the Act of '99, the Legislature adopted, to the extent that it was applicable to our circumstances and the character of the tribunal, the Equity *practice* of England. Again: it is manifest, that in investing the Superior Courts with the jurisdiction, they clothed them with authority to exercise it, not only according to the *forms* of Chancery proceedings in England, with the limitation stated; but also, according to those principles of Law, in obedience to which, that jurisdiction is there exercised. Nor can it be questioned, but that up to the setting down of the cause for trial, they intended the Court to exercise the jurisdiction, independent of a Jury. The Act of '97 is peculiar in its terms : it declares that the Superior Courts shall be competent to *sustain* a suit by bill, &c.

If the *Court* shall *sustain* a suit, that is, do all that is necessary to be done (pass such orders and pronounce such judgments or decrees) to conduct the suit forward to the trial, it is not until the suit is ready for trial, that any mention is made of a Jury; it is at that point, and not anterior to that point, that the Jury intervenes. Before that time, without question, the Court is left to sustain the jurisdiction without the Jury. It is when the cause is set down for trial, that the Statute invokes the coöperation of the Jury. What then, at the trial, are the powers of the Jury? As the Act of '99 is silent upon the matter of the Jury altogether, we are remitted to the Act of '97, for the answer. By that Act, when the cause is set down for trial, it is made the duty of the Court to *submit the merits* of the suit, with the *evidence thereon,* and all matters *respecting the same,* to a special Jury, who shall give their verdict *on the same.* The Jury are brought in for the purpose of the *trial.* According to the Act of '97, it is where the cause is set down for a *hearing,* that the case is to be submitted. In the same connection the Act of '99 uses the word *trial.* I remark, first, that the powers of the Jury are limited to the determination of the facts; *because,* the Statute, in the use of the word *trial,* means the *trial* of the facts. I do not mean to say that when a case is set down for a hearing, in

Mounce *vs.* Byars *et al.*

Chancery parlance, there is nothing to try but the facts; for whilst it is true, that the issue on the facts is usually there the first and most important one to be tried; yet it is also true, that questions of law may, and do generally arise for decision. But I mean to say, that the word, as used in the Act of '99, in connection with the duties prescribed for a Jury, in the Act of '97, are to be taken as indicating for the Jury a trial of facts; because, the usual Common Law meaning of *trial*, without farther designation, is the examination, before a competent tribunal, according to law, *of the facts put in issue in a cause.* See 4 *Mason*, 232.

The matter submitted to the Jury, is the *merits* of the suit. The merits of a suit usually mean the rights of the parties, on the issues made in the pleadings, as distinguished from technical grounds of exceptions to the pleadings, or merely legal grounds of objection to the plaintiff's case, or defendants' defence. Here, merits is used to designate the rights of the parties, growing out of the issues as they are made in the pleadings, so far as they depend upon the facts to be proven. These rights or merits are to be submitted to the Jury. They are to determine those rights, by determining upon the evidence. This is clear from the further requirement of the Statute, that with the merits, *the evidence thereon,* is also to be submitted to the Jury. The evidence *thereon,* is the evidence on or in relation to the merits. There is no other sensible construction but this. *Legal merits* cannot be contemplated; because, questions of Law may grow out of, but are not determinable by the production of evidence. The laws live in the Statute book—in recorded opinions—in the works of venerated sages, and in the mind of living authorized administrators. Merits of fact are determinable by the production of evidence. The Act further requires that *all matters respecting the same,* shall be submitted to the Jury. This plenary clause is restricted in its generality of meaning, by its antecedents. It does not mean all matters respecting the suit, but all matters respecting the merits and the evidence. It is upon the merits referred to, as *the same,* upon which the Act finally requires the Jury to render their verdict. Here then is

the power of the Jury—it is derivable from no other source. It is a power over the facts, and no more. That power is taken from the Court—there is no pretence from this Statute, that he is left with any such power. He is not co-ordinate with the Jury as to them. I cannot consent to let in the aid of implication, to clothe the Jury with legal powers. A power so fundamental—so inappropriate to the Jury, and in my judgment, so destructive, in their hands, of the efficiency and utility of a Court of Chancery as this is, I cannot derive from inference. The Legislature must grant it in terms, before I can recognize it. I am very well assured that they did not intend to grant it in this Act. If they had purposed to introduce so vital a change into the Chancery system as this, is it not the most reasonable of all conjectures, that they would have made it in clear, precise, unmistakable language. The submission of the facts to a Jury in Equity causes, was quite a change itself. A submission to them also, of the law of the case would have been a bold, bad step backward. The able lawyers who framed the Acts of '92, '97 and '99, and the wise statesmen who adopted them, intended, in our judgment, to do no such thing. Having given to the Jury the trial of the facts, after the cause was set down for a trial, and no more, *the Court was left on the trial, with all the powers that belong to the Chancellor, except that;* the most important of which, is the power to declare the law. Such are the views of this Court on this question—views which, so far from being new, are sanctioned by the long continued usage of our Courts, and by the opinions of the most distinguished Jurists of the State. The question being made in this case, we have endeavored to give the reasons of our decision on it, with some carefulness.

[3.] It only remains to say, that it is clearly within the competency of the Chancellor to dismiss a bill on the trial, if there is *no* evidence to a point, which the law makes it necessary for the complainant to prove, before he can recover. Notice of the complainant's lien, to the defendants, or one of them, is indispensable to his recovery; without that, he has no standing in Equity.

[4.] If there was *no evidence* of that fact, in Law, he was not

Mounce *vs.* Byars *et al.*

entitled to recover; and it was competent for the Chancellor so to decide, without the intervention of a Jury.

[5.] But if there was any evidence, however small, the cause ought to have been submitted to the Jury. I proceed to inquire whether there was or not.

[6.] Looking carefully into the record, we find that there is some evidence that the defendant, Goodman, bought with notice; and also, that the defendant, Richard Byars, bought with notice. It is slight, very slight, as to the former. If there be any though, at all, the cause ought not to have been dismissed—any of any kind. There may be no positive testimony, and yet, from the facts proven, the Jury may infer notice. Knowledge that the purchase money had not been paid to the complainant may be carried home to the defendant by circumstances. It is not for the Court to weigh the evidence, and deciding that no notice is proven, dismiss the cause. That right was not assumed in this case, for the Judge dismissed the bill because there was *no evidence* of notice. James Byars was the purchaser from the complainant. The certificates for these lands, being fractional reserves, sold by the State, were transferred by the complainant to him, as evidence of title. They were afterwards placed in the hands of William Byars, as he, William, states, as a security, for a liability which he was under for James. Goodman, in his supplemental answer says, that his contract for the purchase of lots Nos. 66 and 67, being part of the land bought by James Byars, from the complainant, was made with James Byars, with the consent of William Byars; and that William offered to turn over to him the certificates of purchase, and that he refused to accept them; that William then consented that the grants should be issued to him, and he convey to him, (Goodman) which was done. The refusal to take the certificates, which were the evidence of James Byars' title, shows a want of confidence, for some reason, in the safety of a title from him. The arrangement made, that the grants should be taken out in the name of William, and that he should then convey to Goodman, is confirmatory of this want of confidence. What was the ground of this want of confidence does not appear. It may have sprung from a knowledge of the

fact, that James Byars had not paid for the lands, or from some other cause.   These statements have some bearing upon the question of notice.   It is proper that they be submitted to the Jury, in connection with all other facts in the case, for their consideration.

Richard Byars was also a purchaser of some of these lands. Joel Byars testifies, that he acted as agent for Richard, in effecting the purchase.   He says that William Byars had sold to Richard, a tract called the *King Place*, which William wanted to get back; and proposed to the witness, as the agent of Richard, to swap a part of the land, which the complainant had sold to James Byars, (the certificates to which, as before stated, had been transferred to William by James) for the *King Place*; that he, witness, and William Byars, went to James Byars', and William told James that he was going to let witness have the land for Richard; and Polly (James Byars' wife) said, " you had better let Mounce, (the complainant) have his land back, for she knew that James would never be able to pay for it ; and then they all got very mad, and she got mad ; and after some farther conversation, James said there was no chance for him to give Mounce the land back, for Mounce had traded off some of the notes.   James said that Mounce never had and never would lose any thing by him.   We then swapped land.   I, as agent for Richard Byars, swapped the *King Place*, and gave fifty dollars to boot for the part Mounce had sold to James Byars ; and for a four acre lot that James owned before he made the purchase of Mounce."   The same witness testifies that the deed for these lands was made to him, (as agent for Richard Byars) *after* this conversation with James Byars.   By this testimony, Richard bought these lands of James Byars—he made the exchange for William's benefit ; but it seemed to be conceded between the parties, that James had the right of disposing of the Mounce lands.   This testimony clearly charges Joel Byars, the agent of Richard Byars, the purchaser, with notice that James Byars had not paid the complainant for the lands.   Notice to the agent is constructive notice to the principal.   *Com. Dig. Chancery*, 4 c. 5 and 6.   2 *Fonbl. Eq. b.* 2, *ch.* 6, §4.   2 *Eden's R.* 224, 228.

2 *Vern.* 609. *Sugden on Vendors, ch.* 17. 4 *Wheat. R.* 466. 2 *Story's Eq.* §408.

Upon this ground, let the judgment be reversed.