DAVID F. BRYAN and HENRY M. BRYAN, plaintiffs in error, *vs*. The SOUTH-WESTERN RAIL ROAD COMPANY, defendant in error.

1. A non-suit should not be awarded where the plaintiff makes out a *prima facie* case.
2. Where the evidence tends to prove a part performance of a parol contract, the Court should permit the case to go to the jury, and instruct them as to the legal principles applicable to the facts proved.

Assumpsit, &c.   Non-suit.   By Judge CLARKE.   Randolph Superior Court.   November Term, 1867.

This was assumpsit against the South-Western Railroad Company for damages for breach of a contract, made by it in October, 1865, by C. C. Crews, to cut and deliver 40,000 cross-ties upon the railroad, between Dawson and Cuthbert, at forty cents per tie, to be paid for monthly, as inspected and received ; which contract Crews had, with the approval of the defendant, transferred to plaintiffs.   It is averred that plaintiffs, in pursuance thereof, purchased a large tract of land, (otherwise valueless to them) paid hands, purchased provisions, wagons and teams, etc., cut and delivered over four thousand ties, and while they were engaged in performing the contract, without plaintiff's consent and against their protest, defendant notified them that they would receive none after the 10th June, which was so short a time that plaintiffs could deliver only a part of those cut.   They claim the full price of the 40,000 ties, less the amounts already paid.

There was another count in which special damages for breach of the same contract were claimed, another alleging the price at twenty-five cents per tie under said contract, and

another claiming the market value of 40,000 ties under said contract.

On the trial, C. C. CREWS testified that in the fall of 1865, he applied to Virgil Powers, Superintendent of the South-Western Railroad Company, for a contract for 40,000 cross-ties to be delivered between Dawson and Cuthbert, at twenty-five cents per tie; Powers offered to contract for 20,000; Crews said he would not contract for less than 40,000, because a smaller contract would not justify the necessary preparations for complying with such contract. Powers said he could not then contract for 40,000, but would consult the supervisor as to whether 40,000 were needed, (Crews understood him to mean the supervisor on that part of the road) and would write Crews by mail. Soon after, Crews saw Heard, the supervisor on that part of the road, who told Crews he had the contract; Crews supposed it was all right, but does not know that Heard was instructed so to notify him, nor that Heard made such contracts with other parties. Crews knew Bryan had been trying to get a contract for cross-ties, and wishing to go into other business, he turned over this contract to Bryan, he agreeing to fulfill it. Bryan bought axes in New York, made preparations, and did work under this contract. The contract with the road was not in writing. He did not know of any ratification by the officers of the road of his transfer to Bryan.

DAVID F. BRYAN testified that Crews said he had such contract, and turned it over to him, that he bought axes, wrote to his brother to hire hands, bought a tract of land, (at $850.00 in gold and $300.00 in a note) which was worth but little except for the timber, hired hands, bought mules, wagons, etc., and went to work in the latter part of January, 1866.

He and his brother saw Heard soon after, told him they had taken the Crews contract, and were working under it, to which Heard assented. He (witness) never saw Powers about the contract, and does not know whether any other officer of the road, besides Heard, knew of the arrangement. The cross-ties cut were valued under that contract, but whether

they were received and paid for under it or not, he did not know. They would have fulfilled the contract had not the company stopped them, and only ceased when stopped.

RICHARD DAVIS testified, that in 1864, he got cross-ties under a contract made with Heard, that he did not see Powers till he went to get his money, and Powers ordered the bill as reported on by Heard, to be paid. He does not know that Heard ever made contracts with others.

H. M. BRYAN testified, that when he learned his brother had the contract, he came from Talbot county and commenced work, and when asked by Heard how he was at work, told him his brother had gotten a contract from Powers. Learning that this was a mistake, he soon after told Heard that Crews had turned his contract over to his brother, and they were working under that contract. Heard replied: "Yes, I gave Crews that contract," and expressed no dissatisfaction, but as witness understood, assented to it. Soon after this, he and his brother and Heard were together, and his brother told Heard that they were working under the Crews contract. Heard did not dissent, but said "well," and they understood him to assent. Afterwards, in March, Heard inspected the first lot of ties, and received nine hundred or a thousand, and gave witness a ticket to Macon to get his pay for them; he went to Macon and got from Brantly, auditor of the company, pay at thirty and thirty-five cents per tie; this was in April; he did not see Powers.

After witness had cut between four and five thousand other ties—some time in May—he received a pencil note from Heard, stating that the company had ordered him to stop all contractors for ties, as they would not receive the ties.

Soon after this, witness received a verbal message from Weaver, general supervisor of the road, ordering him to stop, as they would receive them no longer. Witness then went to Macon, told Powers he had been stopped from getting ties, told him what arrangements he had made, and that he wished to continue and finish his contract. Powers asked him what was the size of his contract, he replied, "for 40,000." Powers asked him if he was not working the Crews contract,

and witness said he was.   Powers advised him to discharge his hands; he replied that some of them were employed by the year, and could not be discharged.

Witness then insisted that Powers should give him a contract for a less number, (if he would not let him get the 40,000) so as to employ the hands hired for the year.   Powers said he did not need the ties, but would see if the Macon & Western Railroad Company would take them, and would write him as soon as he could ascertain, and told him to continue to work till he decided.   Sometime after, witness received from Powers the following letter :

"OFFICE SOUTH-WESTERN RAIL ROAD COMPANY, }
                 MACON, GA., May 28th, 1866.   }

MR. H. M. BRYAN, *Dawson—Dear Sir :* I am instructed by the Superintendent of this road, (Mr. Virgil Powers) to write you that we will receive all the cross-ties that you have out, and valued on the road, by the 10th day of June next, which is now about two weeks off, and *no more.* We will pay you for those thus valued (by the above date) as soon as we get the money.    Yours Respectfully,

                 VIRGIL POWERS, *Superintendent.*
                         per W. S. BRANTLY."

This letter caused him to stop the work, (it was received only three or four days before 10th June, 1866).   At that time he had thirty hands employed, seventeen of whom were paid a month in advance, and left without repaying him.   He had eight hands employed by the year.

Powers, in the interviews with witness, did not intimate that he had not made such contract, nor that he did not recognize witness as working under it.

After getting the letter, witness delivered all the ties he could by the day mentioned; Heard, the supervisor, inspected and received about twenty-five hundred of them; about two thousand cut could not be delivered by that day.   Witness said to Heard that if the company did not let him go on and complete his contract, he would sue for damages; Heard did not deny the existence of the contract, but only said, "if you do, you will never get any more ties on this road," etc.

Witness received a ticket to go to Macon for his pay ; went there in July, saw Powers, received a check on the bank for

payment, tried to get Powers to receive the balance of the ties. Powers sent witness to see if the Macon & Western Railroad Company would take them, they refused, and witness so told Powers. Powers did not, in answer to witness' complaints, dispute plaintiffs' right to work the contract as contended for.

Brantly never paid him any money for the cross-ties, expressing that the payments were made under the Crews contract, but all the payments he received from any officer of the company, were on specifications made out by Heard, at the rate of thirty and thirty-five cents per tie. Witness had no contract in writing, nor made any contract, except as aforesaid. The current price of cross-ties on the road from the time Crews got the contract, till the last delivery, was from twenty-five to thirty-five cents per tie.

Plaintiffs closed and defendant moved for a non-suit. The Court granted the non-suit, and this is assigned as error.

H. FIELDER, for plaintiffs in error.

W. K. DeGRAFFENRIED and A. HOOD, for defendant in error.

WALKER, J.

1. We think the Court erred in non-suiting the plaintiffs. There certainly was evidence sufficient to make out a *prima facie* case of a contract between the company and the plaintiffs; and where this is the case, a non-suit should not be granted; Mitchell vs. Rome Railroad Company, 17 Ga. Rep., 574; Mounce vs. Byars, 11 Ga. Rep., 192–3. The plaintiffs had made out by proof such a case as entitled them to go to the jury. There was some evidence to sustain the allegations in their declaration. There may be many difficulties in the way of their recovery, but these are matters not for the decision of the Court, but of the jury.

2. The Court decided that this contract was void because not in writing. To this, the reply is, that the evidence tended to prove a part performance of the parol contract on the part

Bryan *vs.* South-Western Railroad Company.

of the plaintiffs.    Where there has been such part performance of the contract as would render it a fraud of the party refusing to comply if the Court did not compel performance," (Rev. Code, Sec. 1941, par. 3) the statute does not apply. Whether there was such part performance as contemplated by this paragraph or not, is a question for the determination of the jury.   The plaintiff made large preparations for getting and delivering timber, whether it was in part performance of the alleged parol contract or not, may be determined hereafter.    The evidence was competent, and as it tended to show that the part performance was made in reference to the contract, the Court should have allowed the case to go to the jury, and should have instructed them as to the legal principles applicable to the facts proved.    When the whole case shall been fully heard, the Court will be better prepared to decide upon the merits of the controversy, and do justice to both parties.

Judgment reversed.